TIDEWATER CONSTRUCTION COMPANY, a Florida Corporation, UNION INDEMNITY COMPANY, a Corporation, and KEY WEST CONSTRUCTION COMPANY, a Florida Corporation, *Plaintiffs in Error*, vs. MONROE COUNTY, FLORIDA, for the use and benefit of PHOENIX ASPHALT PAVING COMPANY, a Florida Corporation, *Defendant in Error*.

146 So. 209.

Division A.

Opinion filed January 9, 1933.

Petition for rehearing denied February 28, 1933

*Evans & Mershon, M: L. Mershon* and *O. B. Simmons,* for Plaintiffs in Error;

*W. H. Malone* and *McClure, Hiaasen & Fleming,* for Defendant in Error.

BROWN, J.—This case is before us on writ of error to the order of the court below granting plaintiff a new trial.

In November, 1925, Tidewater Construction Company entered into two contracts for the construction of cer-

tain roads and bridges in Monroe County, Florida, and at the same time, the Construction Company as principal and Union Indemnity Company as surety executed two bonds to Monroe County, for the satisfactory performance of the contracts, which bonds contained the additional obligation required by section 5397 C. G. L. securing the payment by said contractor "to all persons supplying him, or them, labor, material and supplies, used directly or indirectly by the said contractor, contractors, subcontractor or subcontractors, in the prosecution of the work provided for in said contract." The contracts between the Tidewater Construction Company and the Board of Commissioners of Monroe County were subsequently assigned by the Tidewater Company to the Key West Construction Company, with the consent of the Union Indemnity Company and the Board of County Commissioners which consent appears to have been necessary under the terms of the contracts. One of the contracts was for the construction of a boulevard around the Eastern portion of the island of Key West, for the sum of $582,230., and the bond securing the execution of this contract was in the sum of $136,446.06. The other contract was for the construction of roads from Saddle Bunches to Sugar Loaf in said County, for the sum of $140,241.12, and the bond covering this contract was in the sum of $28,048.22.

Thereafter, on March 25, 1927, the Key West Construction Company and the Phoenix Asphalt Paving Company entered into an agreement by which the latter company was to proceed with the surface treatment with asphaltic oil of projects numbers 3 and 6, as soon as ready, upon the following basis:

"1. It is agreed that the Phoenix Asphalt Paving Company is to furnish their distributor, boiler and man in charge of same, on a basis of $75.00 per day, for every day or fraction of a day that said distributor is working on the above projects and not working, $50.00

per day (lay time). Actual working time is to begin when the said distributor starts on Project #6 and Lay Time meaning any time off for bad weather, delay in receiving oil from car, or the road not being ready to receive oil. Lay Time not to be figured on Sundays.''

''2. The Key West Construction Company to furnish Ford Trucks for transporting sand and oil, and same to be figured on the basis of $12.00 per day per truck with driver and gas.

''3. All other expense for prosecuting the above work, such as oil, sand, labor, and any other supplies or expense are to be charged to the General Expense of the job, and at the completion of both of the above projects the net profits are to be divided one-half to the Phoenix Asphalt Paving Company and one-half to the Key West Construction Company.''

''4. All of the above to be figured on a six day work basis.

''5. It is agreed that Mr. J. F. McFarlin is to be in charge of the distribution of oil on these projects, and when on the job is to be paid on the basis of $15.00 per day and railroad and hotel expense, which is to be charged into the General Expense.

''6. It is agreed that the Phoenix Asphalt Paving Co. is to furnish the Key West Construction Co. a daily report at the end of each day.

''7. Lay Time to be figured only from the starting of work on Project #6 until its completion, and from the starting of Project #3 until its completion. In the event Project #3 is not ready when Project #6 is completed, an allowance of $170.00 for freight in and out is to be paid to the Phoenix Asphalt Paving Company and charged to General Expense.

''8. It is agreed that the Key West Construction Co. Inc., will furnish the financing for the payment of all items of purchase and expense each month and finances for all labor performed semi-monthly.''

Under the provisions of section 5397 C. G. L., Monroe County, for the use and benefit of said Phoenix Asphalt Paving Company, brought this action upon the two bonds

against Tidewater Construction Company, Union Indemnity Company and Key West Construction Company, the plaintiffs in error here, to recover for certain labor and materials alleged to have been furnished to Key West Construction Company by the Phoenix Asphalt Paving Company in the prosecution of the work under said contracts with Monroe County, $6,158.53 for labor and material on the Boulevard work and $1,902.04 on the roads from Saddle Bunches to Sugar Loaf. The jury returned a verdict for the defendants and the plaintiff moved for a new trial, which motion was granted by the court below, and the defendants sued out this writ of error, the only assignment of error being that the court erred in granting said motion.

The main contention of plaintiffs in error is that the court erred in granting said motion, because the evidence failed to show a breach of said additional obligation of the bonds, in that, under the terms of the said agreement above quoted from, the Phoenix Asphalt Paving Company became a joint adventurer and co-principal with, rather than a subcontractor or employee under, the Key West Construction Company in the performance of the contracts between the latter and Monroe County.

This Court has had occasion to define what it takes to constitute the relationship of joint adventurers in Proctor v. Hearne, 100 Fla. 1180, 131 So. 173, and Willis v. Fowler, 102 Fla. 35, 136 So. 358.

Plaintiffs in error contend that the contract between the Key West Construction Company and the Phoenix Asphalt Paving Company embraced all the essential features of a contract of joint adventure; that the Paving Company was therefore not a subcontractor and not entitled to recover on the bonds given by the Construction Company to Monroe County; that the Paving Company acquired an interest in the contracts of the Con-

struction Company with the County, and for the part which it agreed to perform it was to receive one-half of the profits; that such agreement contemplated that the Construction Company should build the roads to a certain point and the Paving Company should finish them; that for the equipment it was to furnish and advance the Paving Company was to be repaid at a stipulated price per diem, and for the equipment to be furnished and advanced by the Construction Company, it was to be repaid at a stipulated price per diem, and all other expenses for the prosecution of the work and supplies necessary therefor was to be charged to the general expense of the job, and when the work was completed, each of the parties was to receive one-half of the net profits to be derived from the whole of the two projects. That while the agreement provided that the construction company should finance the undertaking, it contemplated that it should be repaid before any profits could be declared; that in the last analysis the Paving Company thus became a co-principal with the contractor, the Construction Company, in carrying out that particular portion of the work called for by the contracts with Monroe County.

We hardly think this position can be fully sustained. We think it is apparent from the agreement between the Paving Company and the Construction Company that the Paving Company was concerned only with the job of oiling. It had nothing to do with the clearing, grading or paving of the roads. There was no privity of contract between it and the County. The contract between the County and the Tidewater Company for the construction of the Boulevard and roads had been assigned to the Key West Construction Company several months before the agreement was made between the Phoenix

Asphalt Paving Company and the Key West Construction Company.

As shown by the cases above cited, the question of whether the parties to a particular contract have created between themselves the relationship of joint adventurers is dependent upon their intentions, which is to be determined in accordance with the ordinary rules covering the interpretation of contracts; that joint adventurers are entitled to share in the profits, and must also share the losses, if any; that a joint adventurer is very similar to a partnership, the chief distinction being that a joint-adventurer is usually limited to a single transaction; that although there may not be any express agreement that the parties shall share in the losses, if any, this must have been implied from the agreement made, and or the circumstances surrounding its execution, as having been within the contemplation and intention of the parties. Of course, where the agreement is in writing and free from ambiguity or doubt, its legal effect must be determined as a matter of law, and the intention of the parties gathered therefrom. The agreement here in question contained an express provision for sharing the profits on this oiling work, but to our minds there is nothing in the agreement, nor in the evidence adduced on the trial, to indicate any intention that the Paving Company should share in any losses that might occur.

It must also be noted that the Paving Company had no community of interest with the Construction Company in the capital used in the business. Each company owned certain equipment and continued to own it during the life of the agreement and thereafter. The necessary capital was furnished by the Construction Company. There was no duty upon the Paving Company to contribute toward the capital necessary to do the job. The only feature of the contract between the Construction

Company and the Paving Company which would indicate the relation of joint adventurers or partners was the agreement to share the profit. This alone is not sufficient to constitute the parties partners or joint adventurers. On the other hand, the agreement between the parties indicates that it was devised for the doing of the oiling work by the Paving Company on the basis of receiving a given rental per day for its equipment with the services of its man in charge of its operation, and a share in the profits, if there were any. The contract might well be considered to be one by which the Paving Company was to receive what was to become due to it thereunder, not strictly as profits, but as compensation for the use and operation of its machinery and equipment. The evidence in the case does not indicate any contrary intent. Under the contract, the Paving Company was not expressly or impliedly responsible for any losses that might ensue, nor does it clearly appear that it would have any control over the work, and it had to furnish a daily report at the end of each day to the Construction Company.

In Webster v. Clark, 34 Fla. 637, 639, 16 So. 601-604, it was said:

"The test of partnership, then, is to be found in the intent of the parties themselves as shown by the contract which they make. Where parties enter into a trade arrangement upon such a basis as that they have a community of interest in the capital stock engaged in the business and also a community of interest in the profits resulting therefrom, the uniform rule is that they will be held to be partners in such a venture. Dame v. Kempster, 146 Mass. 454. On the other hand, it has always been held that an agent or servant, whose compensation is measured by the profits of a partnership business, is not thereby made a partner. In Holmes v. Old Colony Railroad Corporation, 5 Gray. 58, it was held that a railroad corporation by leasing a house owned by

it to a party to be run as a hotel, the lessee to pay a certain sum annually and half the net proceeds arising from keeping the house, and keep an account open for inspection by the corporation, and have free passage over the railroad for himself and all persons employed and all articles used in carrying on the hotel, did not thereby become partner in the hotel business. The mere leasing of a hotel for a certain part of the net profits will not make the lessor a partner in the hotel business. This was decided in Beecher vs. Bush, supra. Nor does the renting of a building for a saloon under an agreement to take half of the profits made out of the business done therein as rent make the renter a partner in the business. Thaylor v. Augustine, 55 Mich. 187. In another case the plaintiff contributed towards the business his manufactory, shops, tools, implements and machinery and the land upon which they were situated; the defendants were to furnish a certain sum as capital, and labor to carry on the business. Defendants were to account to the plaintiff at reasonable periods for the proceeds of the business or the profits thereof, and all daily transactions were to be entered on the books, to which plaintiff was to have access, and at stated periods an account was to be taken of the profits, which, after deducting the costs and expenses of running the works and certain expenses, were to be divided between the parties. It was held that there was a community of interest in the capital to carry on the business, and also a community of interest in the profits, and a partnership was thereby created. Wood v. Beath, 23 Wis. 254.''

In Ambrecht Lumber Company v. Adair, 91 Fla. 460, 108 So. 222, it was held that where a person loaned or advanced money or goods to another to be invested in some business or enterprise, the lender to share in the profits as or in lieu of interest on, or in repayment of, such loan or advance, no partnership is thereby created. In the opinion by MR. JUSTICE BUFORD in that case, the above case of Webster v. Clark was cited with approval, and the case of Dubos & Co. v. Jones, 34 Fla.

539, 16 So. 392, was also cited, in which latter case it was said: "The law at one time treated the sharing of profits as a true test that established a partnership, particularly as to third persons, but this doctrine has become entirely obsolete, and is no longer law either in England or in this country." See also Fred Gray Cotton & Gin Co. vs. Smith, 214 Ala. 608, 108 So. 532; Lipscomb v. State, 148 Miss. 410, 114 So. 754; Zuber vs. Roberts, 147 Ala. 512, 40 So. 319; Meinhard vs. Salmon, 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1; Dunn v. Gilbert, 254 Pac. 121; Ross v. Burrage, 233 Mass. 439, 124 N. E. 267; 47 C. J. 662-675. 15 R. C. L. 500-505. To our minds the Phoenix Asphalt Paving Company had no interest in the undivided profits, as profits; it had no right to collect these profits from the County; their receipt and disposition was in the hands of the Key West Construction Company, subject only to the right of the Paving Company to demand payment to it (in addition to a certain amount for the use of its equipment) of an amount equal to one-half of the net profits. In the able brief filed in behalf of plaintiffs in error, it is contended that under the agreement between the parties hereinabove quoted, the profits referred to meant the profits to be derived from the entire work under both contracts, and that the effect was that the Paving Company acquired an interest in both contracts. We do not think that this conclusion must be necessarily drawn from the language of the agreement itself, nor from such language when construed · in the light of the evidence adduced in the case. It is contended that the contracts with the County did not provide for any unit prices, but provided for the payment to the contractor of a lump sum of money, and that the oiling was not separated from any other part of the contract in so far as payment therefor is concerned; and therefore the term "job" as used in the agreement contemplated the

entire work, and that the "net profits" to be divided "at the completion of both projects," meant the net profits on the entire work done under both of the contracts with the County. As above stated, we do not think that the language of the contract between the Construction Company and the Paving Company quite justified such an interpretation, and when construed in connection with the original contracts and the testimony in the case we are quite clear that the construction of the contract contended for by plaintiffs in error is not in harmony with the intention of the parties. The two contracts required the Construction Company to do all of the work through and by its own employees, and while no unit prices are mentioned, the specifications had a special paragraph with regard to the oiling work. The contracts required the Construction Company to clear the land, throw up the fill and grade the roadbed, rock and surface the roadways, and oil the same. The agreement between the Construction Company and the Asphalt Company pertains only to the oiling necessarily incident to the work to be done under the contracts with the County. The contracts referred to called for payments in the respective amounts of over $600,000 in one case and $140,000 in the other. The testimony in the case indicates that the total gross receipts on the oiling work on Project #6 amounted to $18,400. and on Project #3 to $24,283; and that this was upon the basis of 15 cents per square yard for the number of square yards oiled. Surely therefore the parties did not contemplate that the Paving Company was to receive one-half of the net profits to be derived from the whole of the work done or to be done under the two contracts.

There was in this case no community property and no partnership capital, nor any joint ownership of the business, and we are inclined to think that the arrangement

with respect to the sharing of profits was simply for the purpose of determining the fund from which or the amount to which the Paving Company would be entitled at completion for the use of its equipment and services, and that no partnership or joint adventure was intended to be, or was created by, the agreement between the parties, especially when considered in the light of the facts and circumstances out of which that agreement arose, as shown by the evidence in the case.

Before the appellate court will reverse an order granting a new trial, it will require a showing of an abuse of sound discretion, even where there is a conflict in the evidence. 100 Fla. 909, 130 So. 601.

In view of what has been said above, and under the rule announced in the case just quoted from, our conclusion is that the order granting a new trial should be affirmed. It is so ordered.

Affirmed.

BUFORD, C.J., AND WHITFIELD AND DAVIS, J.J., concur.